UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNION NEIGHBORS UNITED, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 13-01435 (RJL) |
| | ) | |
| S.M.R. JEWELL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION
March 17, 2015 [Dkt. ## 35, 37, 38]

FILED
MAR 18 2015
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Plaintiff Union Neighbors United, Inc. ("plaintiff" or "Union Neighbors"),[1] brought this action against Sally Jewell in her official capacity as the Secretary of the Unites States Department of the Interior ("DOI"), Daniel Ashe in his official capacity as Director of the United States Fish and Wildlife Service ("FWS" or "Service"), and Tom Melius, in his official capacity as Regional Director for the Midwest Region of the FWS (together "defendants") on September 20, 2013, challenging defendants' final approval and issuance of an incidental take permit for the killing of endangered Indiana bats at the Buckeye Wind Power Project in Ohio. *See* Complaint at ¶¶ 1-3 ("Compl.") [Dkt. # 1]. Plaintiff claims that defendants' issuance of an incidental take permit violated the Administrative Procedure Act, 5 U.S.C. §§ 701-706, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Endangered Species Act ("ESA"), 16

---

[1] Plaintiff is a non-profit corporation based in Ubrana, Ohio which was formed to promote the safety and well-being of the Champaign County community by addressing issues relating to the siting of industrial wind turbines. Compl. ¶¶ 17-18.

1

U.S.C. §§ 1531 *et seq.*, as arbitrary and capricious, an abuse of discretion, and not in accordance with the ESA's requirement that an applicant will, to the maximum extent practicable, minimize and mitigate the impacts of a taking. *See* Pl.'s Mem. of Law in Support of Pl.'s Mot. for Summary Judgment ("Pl.'s Mem.") [Dkt. # 35-1] at 1-3. Now before the Court are plaintiff's Motion for Summary Judgment ("Pl.'s Mot.") [Dkt. # 35], defendants Jewell, Ashe, and Mellius (the "federal defendants") Cross Motion for Summary Judgment [Dkt. # 38], and defendant-intervenor Buckeye Wind, LLC's Cross Motion for Summary Judgment [Dkt. # 37].[2] After due consideration of the parties' pleadings, the relevant law, and the entire record in this case, the Court agrees with defendants that the incidental take permit was issued in accordance with the law. Accordingly, the defendants' motions for summary judgment are GRANTED, the plaintiff's motion for summary judgment is DENIED, and the case is DISMISSED.

## FACTUAL BACKGROUND

The Indiana bat is a medium-sized migratory bat found in much of the eastern half of the United States with major populations hibernating in Indiana, Kentucky, and Missouri, as well as smaller populations hibernating in other states such as Ohio. AR 49774.[3] The Indiana bat was listed as an endangered species in 1967 due to large decreases in population size and an apparent lack of winter habitat. 32 Fed. Reg. 4,001 (Mar. 11, 1967); AR 49775. There are many ongoing threats to the Indiana bat,

---

[2] Buckeye Wind LLC filed an unopposed motion to intervene on January 8, 2014, which I granted on February 12, 2014. *See* Order [Dkt. # 30].

[3] The parties filed a joint appendix of the administrative record on September 29, 2014, which will be referred to by its individually numbered pages in this Opinion. *See* Notice of Filing of Administrative Record Appendix [Dkt. # 47].

including diseases such as white nose syndrome as well as the relatively new threat of wind turbines. AR 49781-82.

Under development since 2006, the Buckeye Wind Project (the "Project") is planned to be a 100-turbine wind generation facility in west-central Champaign County, Ohio, that will generate 657,000 megawatt hours of electricity annually. AR 47741-42, 47749. Although there are no Indiana bat hibernacula in the immediate area, summer resident bats occur within the vicinity of the Project in June and July, and Indiana bats travel through the area during the spring (April and May) and fall (August through October) as part of their migration to and from hibernacula. AR 47737.[4] Because the operation of the turbines has the potential to injure or kill individual bats, Buckeye Wind applied for an ESA Section 10 Incidental Take Permit ("ITP") and the Project was subjected to a NEPA analysis, which resulted in an environmental impact statement ("EIS").

In the habitat conservation plan ("HCP") submitted by Buckeye Wind as part of its ITP application, an operational scheme was proposed to minimize injury or death to individual bats through the use of higher cut-in speeds that are "feathered." The cut-in speed is the wind speed at which the turbines begin rotating and producing power. When turbines are "feathered," they do not rotate below the increased cut-in speed. AR 47738.

---

[4] Indiana bat hibernacula consist of well-developed limestone caverns where the bats hibernate during winter months. AR 49774. Prior to winter hibernation, bats congregate outside hibernacula building up fat reserves and mating, a period of activity known as swarming. *Id.* Females tend to emerge from hibernacula sooner than males, from the end of March to mid-April, with males emerging by the beginning of May. AR 49775. While some bats remain near hibernacula, Indiana bats can migrate hundreds of miles from their hibernacula to a summer habitat, with a maximum documented migratory distance of 357 miles. *Id.*

3

While the general risk of bat species collision with turbine blades is well-documented, there is little specific data on the risk of Indiana bat collision or what operational speeds would reduce that risk. AR 47855. Accordingly, Buckeye Wind developed a collision risk model based on the available literature, expert opinion, and site-specific empirical data. *Id.*[5] Using studies on the effectiveness of feathering and cut-in speeds, the Project proposal resulted in a take estimate of about 5.2 bats per year using feathered cut-in speeds ranging between 3 m/s and 6 m/s depending on habitat sensitivity and season. AR 47860.[6] The Project proposal also included measures to mitigate the impacts of the takes, such as the acquisition and protection of 217 acres of habitat within seven miles of a "Priority 2"[7] hibernaculum in Ohio. AR 47911.

The Service considered three action alternatives in addition to a no-action alternative in its EIS analysis. First, the Service considered Buckeye Wind's proposal of feathered cut-in speeds, as described above, that vary based on habitat sensitivity and season. *See* AR 45818-37. Second, the Service evaluated the maximally restrictive alternative that required full turbine curtailment at night for a seven month period, thereby eliminating altogether the take of Indiana bats. *See* AR 45837-38. Third, the Service considered a minimally restrictive alternative that required a 5.0 m/s cut-in speed

---

[5] The model used three periods of potential risk: spring migration; summer habitat use; and fall migration. *Id.* The population estimate of bats in the area was conservatively estimated at a summer range of 11 to 2,271 bats, and a spring and fall migratory estimate of 2,900 to 5,800 bats. AR 47856. The model used empirical data to estimate the proportion of bats assumed to be flying within the area of the turbine blades (the "rotor swept zone") and used three probabilities to distribute those estimates. AR 47857.

[6] With no protective measures implemented, the model resulted in a range of annual take from 6.9 to 25.4 fatalities, with the majority occurring in the fall season. AR 47859.

[7] "Priority 2" is a hibernaculum where between 1,000 and 9,999 Indiana bats hibernate.

4

from August through October, the timeframe when most bats of all species are killed. *See* AR 45838.

On July 17, 2013, the Service issued its findings with respect to the Section 10 ITP application based on the analyses from the habitat conservation plan, biological opinion,[8] and environmental impact statement. The Service explained that the statutory standard requires minimization of impacts of the proposed taking to the maximum extent practicable and then mitigation of any remaining impacts to the maximum extent practicable. AR 49964. The Service further explained that these standards are based on a biological determination of the impacts of the project, what would further minimize those impacts, and what would biologically compensate for the remaining impacts. *Id.* The Service's interpretation of the standard is that it is

> the Service's obligation to provide or approve a biologically based suite of avoidance, minimization, and mitigation options that allow the applicant to fully neutralize and/or compensate for the impacts of the taking. If the applicant provides these minimization measures and mitigation measures that are *fully commensurate with the level of impacts*, then it has met that issuance criterion and detailed discussion of 'practicability' is not required.

AR 49964-65 (emphasis added). The Service found that the Project met the required standard, explaining that that the feathered cut-in speeds are the "strictest operational protocols," provide the highest quality habitat areas during the seasonal periods of highest risk, and provide "avoidance measures that are commensurate with potential risk

---

[8] A biological opinion is the final product of a rigorous and lengthy "formal consultation" process by experts at the FWS pursuant to the ESA, which requires review of federal actions that potentially jeopardize a threatened or endangered species. *See* 50 C.F.R. 402.14. The FWS's biological opinion concluded that the Project is "not likely to jeopardize the continued existence of Indiana bats." AR 49824.

to Indiana bats." AR 49965. Based on the take estimated to occur from this operational plan, Buckeye Wind was approved for a five-year take limit of 26 individual takes or 130 individual takes over a 25 year period. AR 50040-42, 47861.

## LEGAL STANDARDS

### I. Standard of Review

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(C). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In this case, where cross-motions for summary judgment are at issue, the Court draws all reasonable inferences regarding the assertions made in a light favorable to the non-moving party. *Flynn v. Dick Corp.*, 384 F. Supp. 2d 189, 192 (D.D.C. 2005). The Court will "grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 383 F. Supp. 2d 1, 3 (D.D.C. 2005).

### II. Standard of Review for Agency Actions Pursuant to ESA and NEPA

FWS's actions are reviewed by this Court in accordance with the judicial review provisions of the Administrative Procedure Act. *NRDC v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000); *Gerber v. Norton*, 294 F.3d 173, 178 n. 4 (D.C. Cir. 2002); *Tulare County v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002). When doing so, the Court must determine whether the challenged decision is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In making this inquiry, the Court "consider[s] whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 415-16. At a minimum, the agency must have weighed the relevant data and articulated an explanation that establishes a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986). In the final analysis, an agency decision is arbitrary and capricious if the agency:

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also County of L.A. v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.").

## ANALYSIS

### I. Standing

As a threshold matter, defendant Buckeye Wind challenges plaintiff's standing on the basis that plaintiff only claims that it is "likely" that its members have seen Indiana bats. *See* Buckeye Wind, LLC's Cross-Motion for Summary Judgment, at 4 [Dkt. # 37-1]. The desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing. *Lujan v. Defenders of Wildlife*,

7

504 U.S. 555, 562 (1992). Injury exists where agency conduct threatens to diminish or deplete the overall supply of endangered animals available for observation and study. *See Humane Soc. of U.S. v. Babbitt*, 46 F.3d 93, 97 (D.C. Cir. 1995).

In this case, it is unquestionable that the Project will result in the killing of Indiana bats. Indeed, the Project, as approved, is permitted to take up to 130 bats over 25 years under the terms of the incidental take permit. *See* AR 49803. Plaintiff has named specific members who have attested that they live near Buckeye Wind's proposed facility and that the Project will imminently harm their interest in observing and benefiting from the Indiana bats.[9] Moreover, the Supreme Court itself in *Summers v. Earth Island Institute*, which is relied upon by defendant, addressed different factual circumstances where *unidentified* members of a national organization might visit *unidentified* parcels affected by FWS procedures. *See* 129 S. Ct. 1142, 1151 (2009). Accordingly, plaintiff does, indeed, have standing to challenge the agency actions at issue.

## II. Endangered Species Act

Plaintiff argues that FWS inappropriately applied the Endangered Species Act ("ESA") by not "minimizing" the take to the lowest possible amount *before* applying mitigation measures to offset any take that could not possibly be avoided or minimized. Pl.'s Mem. at 14. I disagree. Although plaintiff's two-step approach may be a reasonable interpretation of the statutory language, the statute does not compel its preferred interpretation, and the agency's interpretation must be upheld.

---

[9] *See* Affidavit of Robert McConnell [Dkt. # 42-1]; Affidavit of Julia F. Johnson [Dkt. # 42-2]; Affidavit of Anita Bartlett [Dkt. # 42-3]; Affidavit of James Bartlett [Dkt. # 42-4]; Suppl. Affidavit of Julia Johnson [Dkt. # 42-5]; Suppl. Affidavit of Anita Bartlett [Dkt. # 42-6].

The ESA prohibits the taking of any listed endangered species within the United States. 16 U.S.C. § 1538(a)(1)(B), (G). Section 10 of the ESA provides an exemption from the take prohibition if the take is incidental to otherwise legal conduct and if the take "will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." 16 U.S.C. § 1539(a)(2)(B). A permit for such incidental taking shall issue if there is a finding, inter alia, that the applicant "will, to the maximum extent practicable, minimize and mitigate the impacts of such taking." 16 U.S.C. § 1539(a)(2)(B).

The standard that an applicant will "to the maximum extent practicable, minimize and mitigate the impacts" of the taking is not defined in either the statute or in formal agency regulations. *See Nat'l Wildlife Fed'n v. Norton*, 306 F. Supp. 2d 920 (E.D. Cal. 2004) ("*Norton I*"). However, the 1996 Habitat Conservation Planning and Incidental Take Permit Handbook ("Handbook"), jointly promulgated with National Marine Fisheries Service after notice and comment, provides guidance on an agency's interpretation of this provision. *See* AR 61315-16. The Handbook permits an agency to place less emphasis on whether a program is the "maximum that can practically be implemented by the applicant" *if* an applicant can first demonstrate that the minimization and mitigation provide substantial benefits to the species. AR 61315-16. Here, the FWS found that the minimization and mitigation measures "fully offset" the impact of the taking of Indiana bats, and thus, it was not necessary to determine if the plan was the "maximum that can be practically implemented by the Applicant." AR 50060.

9

Where statutory language such as "maximum extent practicable" is ambiguous, a reasonable construction of the language by the Service is entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). *See, e.g., Int'l Internship Programs v. Napolitano*, 853 F. Supp. 2d 86, 97 (D.D.C. 2012). In *Norton I*, the agency's interpretation of the maximum extent practicable standard, on facts very similar to those here, was afforded *Chevron* deference. The challengers in *Norton I* advanced a reading that would require a developer to mitigate as much as the developer could possibly afford. 306 F. Supp. 2d at 927-28. The *Norton I* court rejected this reading and upheld the agency's interpretation that no additional mitigation was required once the impact was fully mitigated. *Id.* ("the statutory language does not suggest that an applicant must ever do more than mitigate the effect of its take of species"). The *Norton I* court noted that the agency interpretation was "entirely reasonable and avoids absurd results," as well as avoids "unduly enmeshing the Service in developers' economic affairs and projections." 306 F. Supp. 2d at 928; *see also WildEarth Guardians v. FWS*, 622 F. Supp. 2d 1155, 1165 (D. Utah 2009) (FWS has interpreted the maximum extent practicable language "to mean mitigation that 'is rationally related to the level of take under the plan,' and courts have agreed with this interpretation" (citation omitted)).

The same analysis applies here. The FWS found that Buckeye Wind's Project has "minimization measures and mitigation measures that are *fully commensurate* with the level of impacts" and that the Project "implements mitigation that offsets the impacts of the take," and, as a result, the Project has "minimized and mitigated to the maximum

10

extent practicable." AR 50057 (emphasis added). Once the impact was fully mitigated, it was not necessary for FWS to determine whether more mitigation was possible, or whether the impact could possibly be minimized further.

Undaunted, plaintiff further argues that *Chevron* deference is *inappropriate* because the plain meaning of the statute demonstrates Congressional intent contrary to the Service's interpretation. Pl.'s Mem. at 11-12. I disagree. Plaintiff claims that the dictionary definition of "minimize" means "to reduce take until further reduction is impracticable." Pl.'s Mem. at 16-17, 20-21. However, the *Norton I* court rejected precisely this restrictive definition as the only one compelled by the text of the statute, noting that "maximum extent practicable" does not mean "the most that can possibly be done" or "the most the developers could pay while still going forward with the project." 306 F. Supp. 2d at 928 n.12. The *Norton I* court found that while the statutory meaning is "not entirely clear, the term does not simply equate to 'possible.'" *Id.* Instead, "practicable" is more often used to mean "along the lines of 'reasonably capable of being accomplished.'" *Id.* (citing Black's Law Dictionary (7th ed. 1999)).[10]

---

[10] Plaintiff also argues that because ESA Section 7 requires an incidental take statement with a specified amount or extent of take, then the meaning of ESA Section 10's "impact of . . . taking" language must also be in terms of a specific numeric amount, and, that "maximum extent practicable" must then be interpreted to require FWS only to approve proposals with the lowest possible number of individual takes. Pl.'s Mem. at 17-19. However, plaintiff ignores that the two provisions serve different purposes, *see WildEarth Guardians v. U.S. Fish & Wildlife Serv.*, 622 F. Supp. 2d 1155, 1163-64 (D. Utah 2009) ("Section 7 requirements does not support that an incidental take permit must include the specific numeric take amount."), and that the "impact" language has been treated differently in regulations of Section 10. *Compare* 50 C.F.R. § 17.32(b)(1)(iii)(B) (requiring information about the species to be covered, including the number, age, and sex of individuals, if known) *with id.* § 17.32(b)(1)(iii)(C) (requiring a habitat conservation plan that specifies the impact that will likely result from such taking).

As discussed above, FWS used the best available scientific evidence and modeling, as well as its expertise, to conclude that the Proposal will adequately protect the Indiana bat. Accordingly, that conclusion is entitled to deference because it is rational and Congress has entrusted those decisions to the Service. *See See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008) ("The rationale for deference is particularly strong when the [agency] is evaluating scientific data within its technical expertise [.]" (citation omitted)); *Loggerhead Turtle*, 120 F. Supp. 2d. 1005, 1022 (M.D. Fla. 2000) (the Service's selection of minimization and mitigation measures "is entitled to deference due to its biological expertise.").

In addition to challenging the agency action under *Chevron*, plaintiff argues that *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002), establishes a rule under the ESA whereby the Service cannot ignore plaintiff's proposed reasonable alternative[11] because the alternative would further reduce take and, therefore, the agency must make an independent assessment that its proposed reasonable alternative is impracticable. *See* Pl.'s Mem. at 37-40. Simply put, plaintiff misreads *Gerber*.

In *Gerber*, the Service made a finding that an alternative existed that would reduce the taking of the affected species, and the developer even acknowledged that this alternative would "greatly reduce" the takes at issue. *Gerber*, 294 F.3d at 185. In response the Service did *not* prepare an "independent" analysis, but rather it "relied on the developer's word that the proposed alternative was impracticable, without any

---

[11] Plaintiff presses for its preferred 6.5 m/s cut-in speeds instead of the Project's proposed feathered cut-in speeds that range from 3.0 to 6.0 m/s. *See* Pl.'s Mem. at 37-40.

12

supporting analysis." *Nat'l Wildlife Fed'n v. Norton*, No. 04 Civ. 579, 2005 WL 2175874 at *18 (E.D. Calif. Sept. 7, 2005) ("*Nortion II*") (*citing Gerber*, 294 F.3d at 185). Here, by contrast, the administrative record shows that the Service satisfied its duty to make the maximum extent practicable finding because the Service made a finding that Buckeye Wind's proposal contained mitigation measures that would "fully offset" the impacts of the taking, and that the Project would therefore not have statistically significant population impacts on the Indiana bat. *See* AR 50059-60 (concluding that impact of the taking is minimized "to the maximum extent practicable—to the extent that the impacts are insignificant"). *Gerber* is therefore inapposite because in this case the agency made the required finding under the ESA. Furthermore, it would be unnecessary, and indeed wasteful of agency resources, for this Court to require that the Service reject proposed alternatives as impracticable *even after* the Service has first found that proposed minimization and mitigation measures have "fully offset" the impact to a species and that a project will not have a statistically significant impact on the species. *See Norton I*, 306 F. Supp. 2d at 928 (approving similar FWS interpretation to avoid "absurd results").

The meaning of "maximum extent practicable" is ambiguous, and FWS's interpretation is reasonable, as was its application of its interpretation to the specific Project at issue. As a result, FWS did not violate the EPA when it issued the incidental take permit to Buckeye Wind.

## III. National Environmental Policy Act

Finally, plaintiff contends that defendants violated NEPA by failing to consider its preferred reasonable alternative of 6.5 m/s cut-in speeds in the EIS. Pl.'s Mem. 40-45. I

disagree. Our Circuit Court has held that an agency "bears the responsibility for deciding which alternatives to consider in an environmental impact statement," and that its decision must only follow the "rule of reason." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (citations omitted). The selection of alternatives must be reasonable, as defined in relation to the objectives of a particular action that the agency sets out. *Id.* at 195–96 (citing 40 C.F.R. §§ 1502.14(a)-(c), 1508.25(b)(2)). Under the rule of reason standard, the Court will "uphold an agency's definition of objectives so long as the objectives that the agency chooses are reasonable," and its "discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Id.* at 196.

Here, the Service considered *three* action alternatives in addition to a no-action alternative in its EIS analysis. As discussed above, the Service considered not only Buckeye Wind's proposal but a maximally restrictive alternative, a minimally restrictive alternative, as well as a "no action" alternative. AR 45818-38. The omission of plaintiff's preferred proposal does not negate the fact that the alternatives that the agency did analyze were reasonable. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 744 F. Supp. 2d 151, 161 (D.D.C. 2010) ("The agency's objective did not involve reducing development, and thus the [agency's] decision to omit a scaled-back development alternative from its analysis did not violate NEPA."); *see also City of Alexandria, Va. v. Slater, 198 F.3d 862, 869 (D.C. Cir. 1999)* (noting that the scope of "reasonable alternatives" is narrower when the project is not of "national scope" but rather is a "discrete" project such as a "single canal or dam"). The objective at issue

14

here—approving a wind-turbine facility—is commensurate with the scope of the alternatives considered by the agency, and, as a result, the Service did not violate NEPA.

## CONCLUSION

Thus, for all of the foregoing reasons, defendants' actions complied with the relevant provisions of NEPA, ESA, and the APA, and will be upheld. Accordingly, defendants' motions for summary judgment are GRANTED, plaintiff's motion for summary judgment is DENIED, and this case is DISMISSED with prejudice. A separate Order consistent with this decision accompanies this Memorandum Opinion.

*[signature]*
RICHARD J. LEON
United States District Judge